Joseph D. SHAW, Plaintiff,

v.

NON–LINEAR SYSTEMS, INC., Defendant.

Civ. A. No. 3152.

United States District Court
S. D. Ohio, W. D.

Nov. 4, 1969.

Robert J. Fay, of Fay, Sharpe & Mulholland, Cleveland, Ohio, Lawrence B.

Biebel and Joseph G. Nauman, of Marechal, Biebel, French & Bugg, Dayton, Ohio, of counsel, for plaintiff.

Arthur L. Cain, Wm. Crighton Sessions, of Bosworth, Sessions, Herrstrom & Cain, Cleveland, Ohio, and H. Talman Dybvig, of Dybvig & Dybvig, Dayton, Ohio, of counsel, for defendant.

WEINMAN, Chief Judge.

This case involves the alleged infringement by defendant of a patent owned by plaintiff for an "Electrical Measuring Device".

We are involved primarily with the J. D. Shaw patent 2,497,961 and in particular the validity of Claims 1 and 3 of this Shaw patent. Claim 1 reads as follows:

"An electric measuring device comprising a source of unknown voltage, a stepping relay having a number of resistors of predetermined and uniform values connected in series, a tap connected to the end of each resistor, and including a zero tap, said zero tap being connected to one terminal of the unknown voltage, a movable switch arm adapted to successively engage the taps, a source of known voltage connected across the series of resistors to constitute the known voltages applied by the stepping relay an opposition circuit to the unknown voltage, actuating means interposed in the opposition circuit between the switch arm and the remaining terminal of the unknown voltage and responsive to an unbalance in said circuit, means connecting the relay means with the arm actuating means to change the value of potential difference applied by the stepping relay, a polarity reversing relay in the opposition circuit, and means actuated by the zero tap contacting position of the stepping relay arm for operating the polarity reversing relay."

Claim 3 reads as follows:

"An electric measuring device comprising a source of unknown voltage, a stepping relay having a number of resistors of predetermined and uni-

form values connected in series, a tap connected to the ends of each resistor including a zero tap at one of the series connected to one terminal of the unknown voltage, a movable switch arm adapted to successively engage the taps, a source of known voltage connected across the series of resistors to constitute the known voltages applied by the stepping relay an opposition circuit to the unknown voltage, advancing and retracting mechanism for the arm, a pair of polarized relays responsive to an unbalance in said circuit, means connecting the polarized relays with the mechanism to change the value of potential difference applied by the stepping relay to substantially balance the unknown voltage in the opposition circuit, a polarity reversing relay in the opposition circuit, and means actuated by the zero tap contacting position of the stepping relay arm for operating the polarity reversing relay."

The following material stipulations were entered into by the parties to this action:

1. Plaintiff, Joseph D. Shaw, who formerly resided in Cincinnati, Ohio, resided in Cleveland, Ohio, at the time the Complaint herein was filed, and now resides in Brownsville, Pennsylvania.

2. Defendant, Non-Linear Systems, Inc., is a California corporation, having its principal place of business at Quality Lane, Del Mar, California.

3. Of the various types of Digital Voltmeters made and sold by defendant, the Shaw patent 2,497,961 is only alleged to cover those having stepping switches, incorporating automatic polarity reversing and using what is known as tracking logic.

4. Digital Voltmeters which
   (a) have manual polarity reversing means;
   (b) do not have stepping switches;
   (c) use scan logic, tracking scan logic, no needless nines, modified tracking scan logic or double scan logic; or

    (d)   are of voltage to frequency types

are not charged to infringe the patent in suit.

5. Plaintiff only charges defendant with infringement of Claims 1 and 3 of the patent in suit.

6. In April 1961, plaintiff wrote to defendant charging defendant with infringement of his patent. Defendant's counsel answered July 25, 1961, denying infringement and stating in part that Non-Linear would: "Consider this matter closed unless you can produce satisfactory information showing that your patent may be given a different interpretation than we are able to find."

7. At that time, July 1961, plaintiff was in his fourth year of private practice of medicine in the Cincinnati, Ohio area.

10. Plaintiff filed his patent application in January 1946. Said Patent No. 2,497,961 was issued on February 21, 1950 with four claims.

11. Defendant developed its first digital voltmeter in 1952 and 1953.

12. Plaintiff was in medical school from 1951 through 1955 and taking his internship in medicine in 1955–1956.

13. Plaintiff has been title holder of Patent No. 2,497,961 since February 21, 1950, and owns all of the rights in said patent. The patent expired February 21, 1967.

14. Within the period commencing six years prior to the date of the Complaint herein, defendant made and sold digital voltmeters, having model designations 481, 481A, 484, 484A, 484B, R65'S, 4800 Series and 4900 Series, which are charged to infringe Claims 1 and 3 of the patent in suit. Defendant sold its digital voltmeters accompanied by catalogs and manuals which provided instructions and information for using, servicing and maintaining the equipment. These catalogs and manuals include wiring diagrams and pictures of the equipment which correspond to the correspondingly identified equipment that was made and sold by defendant. Drawing No. 11271 is a wiring diagram of Model No. 481; Drawing No. 11375 is a wiring diagram of Model No. 484A; Figure 4–6 is a schematic drawing of the logic used in both said models.

15. In Shaw patent 2,497,961 an analog type meter, 71, is shown to which there are five leads.

16. Defendant marketed its first digital voltmeter in 1953 and continued the introduction of new models which have been in production and sale.

17. About the time he filed his patent application in January 1946, plaintiff produced a model which was not a model of the circuit disclosed or claimed in Shaw patent No. 2,497,961. That model has been preserved, unused, in the family homestead in Cincinnati, Ohio for more than twenty-two years, although various parts have been removed from it by plaintiff for other purposes.

18. From January 14, 1946 to the present, the electrical measuring device of Claims 1, 2, 3 and 4 of patent No. 2,-497,961 has never been manufactured, sold or distributed by plaintiff or any assignee, grantee, licensee or agent of plaintiff.

19. Unidirectional stepping switches with a plurality of wiper arms were publicly known, made, sold, publicly used and publicly offered for sale prior to October 1944.

20. From prior to 1961 defendant made, used, sold and offered for sale digital voltmeters which are not alleged to infringe the patent in suit, such as digital voltmeters which

    (a)   have manual polarity reversing means;

    (b)   do not have stepping switches;

    (c)   use scan logic, tracking scan logic, no needless nines, modified tracking scan logic or double scan logic; or

    (d)   are of voltage to frequency types.

21. From prior to 1961 defendant made, used, sold and offered for sale dig-

ital voltmeters which are not alleged to infringe the patent in suit such as digital voltmeters which

(1) have manual polarity reversing means;

(2) do not have stepping switches;

(3) use scan logic, tracking scan logic, no needless nines, modified tracking scan logic or double scan logic; or

(4) are of voltage to frequency types.

The Court determines that it has jurisdiction over the parties and the subject matter. Section 1338(a), Title 28 United States Code. Proper venue lies in this District. Section 1400(b), Title 28 United States Code.

The defenses relied upon by the defendant may be stated briefly as follows: 1) The patent is invalid because the patent is obvious to one of ordinary skill, 2) The claims are ambiguous and do not distinctly point out and claim the invention, 3) The claims fail to include an essential element of combination, 4) The claims overclaim the invention in the use of such terms, 5) Lack of utility, and 6) The patent and claims each contain new matter and no Supplemental Oath was filed. The defendant also contends that its digital voltmeters do not infringe plaintiff's patent.

## FINDINGS OF FACT

1. A digital voltmeter is a device for measuring an unknown voltage in which the value of the unknown is read directly in Arabic numerals, displayed in a straight line with a properly located decimal point the way an ordinary number is normally written. The user need not count nor measure the position of any arm or other indicator or interpolate between adjacent lines on a scale.

2. Defendant's digital voltmeters have always been offered with and without automatic polarity reversal or indication.

3. All of defendant's digital voltmeters were provided with internal standard cells and a highly stabilized reference voltage to calibrate the instrument and ensure that a highly accurate determination of the unknown was made.

4. Mr. Kay developed defendant's digital voltmeters including those alleged to infringe Shaw's patent, without any knowledge of Shaw or his patent.

5. Patent No. 2,497,961 in suit entitled "Electrical Measuring Device" discloses a deflection potentiometer for measuring unknown voltages.

6. Deflection potentiometers have been known for many years prior to 1944 and included in combination a basic potentiometric circuit using a voltage divider, in which an unknown voltage was partially balanced by an opposing known voltage, and a galvonometer on which the remaining imbalance was read on a meter.

7. Shaw never made any model or other apparatus embodying the subject matter claimed in his patent. Shaw's patent was never licensed or assigned and neither he nor anyone claiming under him ever attempted to utilize or commercialize his disclosure in any way.

8. Shaw's patent is a paper patent.

9. In the electrical measuring device of the patent in suit, voltages to two significant figures (units and tenths) are read by counting the positions of the arms on the stepping switches and the remaining significant figures are obtained by then adding to that number the value of the imbalance as read on the analogue voltmeter 71.

10. The Shaw patent does not disclose nor suggest any means for reading the stepping switches disclosed therein in ordinary Arabic numerals (digits) or for reading the voltage as a straight line number as in true digital voltmeters, such as were introduced by defendant. The Shaw patent contains no mention of or teaching with respect to the words "digit" or "digital".

11. Shaw's electrical measuring device is an analogue, not a digital device.

12. Polarity reversal relays and the need for polarity reversing switches for

conventional voltmeters and for potentiometers, to enable them to measure unknown voltages of opposite polarities, were both known long prior to 1944.

13. The deflection potentiometer or electrical measuring device disclosed in the Shaw patent purports to measure an unknown voltage by partially balancing an opposing known voltage thereagainst, using a voltage divider in an opposition circuit in accordance with the well-known potentiometric balancing system. The remaining imbalance is read by a conventional voltmeter 71.

14. The relays 33, 34, 39 and 55 in the Shaw patent are ordinary electromagnetic relays. They are of different structure, function differently and obtain a different result than thyratron tubes which are used in the defendant's devices. Shaw makes no teaching nor suggestion as to how one or more of said relays could be replaced by one or more thyratron tubes and phase inverters, and this could not be done except by departing from Shaw's teaching and rebuilding his disclosure in the light of the prior art and defendant's structure.

15. The current in the plate circuit of the vacuum tube 19 of Shaw is, of necessity, unidirectional.

16. A relay, as commonly used prior to October 1944 and as used and depicted in the Shaw patent, is an electromagnetic device in which an armature is caused to move by a current flow in a coil.

17. Polarized relays were old and well-known long prior to October 1944. Such relays are responsive to a change in direction, not magnitude, of current flow.

18. Marginal relays were old and well-known long prior to October 1944. Such relays respond to a change in magnitude, not direction, of a current flow.

19. Relays 33 and 34 in Shaw are marginal relays, not polarized relays.

20. The so-called polarity reversing relay disclosed by Shaw comprises five armature operated switches, two of which, 6 and 22, interchange the leads between the stepping switches and the unknown, two of which, 44 and 73, interchange the connections between the marginal relays 33 and 34 and the relays 39 and 55 so that a change in magnitude of the plate circuit current will move the stepping switches in the opposite direction, and one of which, 93, conditions the voltmeter 71 to accept voltages of the opposite polarity.

21. Shaw's electrical measuring device is at mechanical and electrical zero both before and after polarity is reversed. Neither the zero position of the stepping switch arm nor anything responsive to the zero position, actuates polarity reversal in* the Shaw device. The sequence of operation is that the switch arm 12 steps to zero, the nubbin on the arm, in the manner of the usual off-normal stepping switch, closes a switch 89, actuating a time delay relay 90 which diverts the next pulse of current to operate the polarity reversing relay, i. e., armature 7 and switches 6, 22, 44, 73 and 93, while the stepping switch arm 12 remains in electrical and mechanical zero. Then, after a further delay and another pulse of current is released by timer 51, the stepping switch arm moves from the mechanical and electrical zero position.

22. (a) Stepping switches have been known and used since prior to 1900 and were known and used in apparatus using the potentiometric balancing method for measuring unknown voltages prior to October 1944.

(b) Stepping switches with off-normal switches, i. e., switches which are actuated by a nubbin or contact on the stepping switch arm as the stepping switch arm contacts the zero tap were old and well-known long prior to October 1944.

23. Voltmeters and potentiometers with manual and automatic polarity reversing means for measuring unknown voltages were old and well-known long prior to 1944 and separate automatic polarity reversing relays were a standard item of commerce purchasable by anyone for use in and/or with any type of voltmeter or potentiometer as desired.

24. The Leeds and Northrop K–2 potentiometer was made, sold and in public use for many years prior to October 1944. The K–2 was an extremely accurate instrument using the potentiometer principle to measure unknown voltages to five significant figures and with an error of only $\frac{1}{10}$ of 1%.

25. Multi-range voltmeters, with an accuracy comparable to the K–2 and capable of measuring unknown voltages from a hundredth to ten volts were made, sold and in public use long prior to Shaw's October 1944 conception date.

26. Thyratrons, such as shown in McAlpine Patent No. 2,444,202 filed November 21, 1942 were also made, sold and in public use long prior to October 1944. Thyratron tubes have no moving parts and in defendant's devices and in the McAlpine patent respond to an alternating current signal when the grid goes more positive relative to the plate and ceasing fire when the wave changes direction. The structure of thyratron tubes is entirely different from the structure of electromagnetic relays of the types indicated in the Shaw patent by reference characters 33, 34, 39 and 55, and thyratrons function in a totally different way, in response to different stimuli, to produce a substantially different result.

27. Zero-left and zero-center voltmeters were old and well-known long prior to October 1944. Zero-left voltmeters were the standard or conventional type and commonly called "voltmeters". Zero-center voltmeters when desired had to be specifically so called. Shaw only discloses a "conventional" or zero-left voltmeter.

28. Voltmeters, potentiometers and electrical measuring devices in which the arm advanced over a coil or along taps, so as to make discrete steps, as well as voltmeters, potentiometers and electrical measuring devices in which the arm slid continuously along a wire were all old and well-known prior to October 1944 and are electrically equivalent with respect to adding and subtracting resistance.

29. The opposition circuit as disclosed by Shaw means that circuit which connects the balancing voltage with the unknown voltage and does include the plate circuit, from plate 290 externally through battery 32 to cathode 23, and the circuits between the marginal relays 33 and 34 and the stepping switches 4 and 5.

30. Unlike defendant's device, there is no way of standardizing or calibrating the Shaw device and the batteries shown are unstable as they are always being discharged. Thus, Shaw's device is basically inaccurate.

31. The Shaw device is inaccurate, lacks utility and does not represent an advance in the art over the devices known and used prior to Shaw's alleged invention.

32. The voltmeter 71 is essential to the operation of the Shaw device and its presence is required by the language of each of claims 1 and 3 which includes as an element of the polarity reversing relay the switch 93 for conditioning voltmeter 71.

33. Prior to filing his patent application, Shaw had a search made and learned of the Wunsch Patent No. 2,285,482 which taught automatic polarity reversal means in an environment essentially identical to the environment of the Shaw disclosure.

34. Wunsch 2,285,482 is the closest prior art and neither Wunsch, McAlpine 2,444,202, Gilbert 669,942, nor Widmer 2,115,831, each of which shows automatic polarity reversal in a potentiometric circuit, nor any other prior art patent or reference showing manual or automatic polarity reversal means, was cited or relied upon by the Patent Office.

35. Originally Shaw disclosed but did not claim or include in his statement of invention anything relating to automatic polarity reversal. After his original claims, without polarity reversal, were rejected, he amended his application to include automatic polarity reversal as an object and to define the polarity reversal relay as including five armature

operated switches, to wit: switches 6, 22, 44, 73 and 93, but did not file a Supplemental Oath as required by Rule 67 (a) of the Patent Office Rules of Practice. Shaw knew of the Wunsch patent and its disclosure of automatic polarity reversal but he did not call it to the examiner's attention.

36. The substantive difference between Shaw application claim 12, the narrowest claim rejected on the art by the Patent Office and cancelled by Shaw, and Shaw's application claim 13, which became patent claim 1, is the polarity reversal relay and its actuating means. The inclusion of polarity reversal in the amended application was the key factor which caused the Patent Office to issue the patent in suit.

37. McAlpine 2,444,202, which has an effective date prior to Shaw, shows the use of thyratrons in a voltage responsive device having a potentiometric circuit for applying predetermined increments of a known voltage in opposition to an unknown voltage signal and defendant's device with respect to its amplification and stepping switch control means is more similar to McAlpine than to Shaw. Thus, McAlpine has the same phase invertors as defendant's accused digital voltmeters and the same pairs of thyratron tubes which react to an imbalance between the known and unknown to add or subtract resistances in a voltage divider to increase or decrease the value of the known voltage applied to balance the unknown in order to obtain the desired reading. The circuitry of McAlpine and the circuitry of defendant's accused voltmeters are substantially identical with respect to the means responsive to an imbalance between the known and unknown to control the application of the known voltage.

38. Choppers, such as are used in defendant's digital voltmeters were old and in public use long prior to the date of Shaw's alleged invention.

39. Defendant's digital voltmeters do not have a known voltage in opposition or series opposition to an unknown. Defendant's digital voltmeters have a comparison, not an opposition circuit, wherein a chopper makes successive samples of the unknown and known voltages creating an alternating square wave signal which is utilized to vary the known voltage in predetermined sequence, until successive samples show the two voltages are equal.

40. The level of ordinary skill in the electrical measurement field was very high in October 1944.

41. Each of the elements of each of claims 1 and 3 of Shaw is shown and taught by Wunsch U. S. Patent No. 2,285,482 in the same environment except that Wunsch uses a continuously variable voltage divider and Shaw uses an equivalent voltage divider which varies in discrete steps and Wunsch teaches automatic polarity reversal means whereas Shaw claims a specific polarity reversal relay comprising five armature operated switches.

42. The Patent Office found Roberts disclosed or made obvious all of the elements of claims 1 and 3 except the polarity reversal relay and its actuation by rejecting application claim 12 on Roberts. Shaw conceded this irrevocably by cancelling claim 12.

43. Claims 1 and 3 of Shaw's patent are indistinct and ambiguous in defining "opposition circuit" and do not conform, in this respect, with the specification.

44. Claims 1 and 3 of the Shaw patent are not infringed by defendant's digital voltmeters because the polarity reversal relay set forth in each said claim, by Shaw's own definition, includes a switch 93 to condition a conventional voltmeter to measure voltages of opposite polarity and no such switch or device of equivalent structure, function, mode of operation or result is embodied in defendant's digital voltmeter.

45. Claims 1 and 3 of the Shaw patent are not infringed by defendant's digital voltmeters because the polarity reversal relay set forth in each claim, by Shaw's own definition, includes two switches 44 and 73 for reversing the con-

nections between two marginal relays 33 and 34 and two other relays 39 and 55 which control the stepping switch advancing and retracting mechanisms so that the relay which advanced the stepping switch arms will retract them and the relay which retracted the stepping switch arms will advance them. No such switches or any switches of equivalent structure, function, mode of operation or result are embodied in defendant's meters since in defendant's devices the same phase converters, thyratrons and amplifiers do the same thing and obtain the same result without regard to the polarity of the unknown and since defendant's stepping switches always move in the same direction.

46. Claims 1 and 3 of the Shaw patent are not infringed by defendant's digital voltmeter because each claim requires "means actuated by the zero tap contacting position of the stepping relay arm for operating the polarity reversal relay" and none of the stepping relay arms which apply the known voltage in defendant's accused devices operates or is concerned with the operation of any polarity reversal means, relay or structure. Instead, in defendant's digital voltmeter, polarity reversal is obtained by a different arm in a different switch. Further, polarity reversal in defendant's device occurs at the same time as the applied voltage goes from zero to a real substantial value and not while the applied voltage remains at zero. Polarity reversal occurs by a single crossover of the connection between the known voltage and the comparison device, not by changing five switches and the function and effect as in Shaw. Defendant's structure functions in a different way to produce a different, more accurate result than obtainable with the Shaw device.

47. Claim 1 of the Shaw patent is not infringed by defendant's digital voltmeters because that claim requires "relay means interposed in an opposition circuit between the switch arm and the remaining terminal of the unknown". This refers to the marginal relays 33 and 34 and the circuit of which they are a part. The claim requires that these relays be interposed in the circuit between the switch arm 13 and terminal 24. Defendant's digital voltmeters use thyratron tubes responsive to an alternating wave, not marginal relays responsive to change in magnitude of direct current, to control the movement of the switch arm in a different way. Further, defendant's thyratrons are not interposed between the switch arms and the chopper in defendant's comparison circuit and are not *responsive* to an *imbalance* in the opposition circuit, but to the difference in signal generated by a comparison between the unknown voltage and the known voltage as determined by the chopper and the resultant square wave (alternating) voltage signal generated in an entirely different circuit.

48. Claim 3 of the Shaw patent is narrower than claim 1 and is additionally not infringed by defendant's digital voltmeter because (a) claim 3 requires an advancing and retracting mechanism for the switch arm and defendant has no retracting mechanism in its digital voltmeters and (b) claim 3 requires a pair of polarized relays and the defendant has no such relays in its digital voltmeters responsive to a change in direction of current flow.

49. Claim 3 of the Shaw patent is ambiguous and misdescriptive in setting forth "a pair of polarized relays" as an element of the patented combination, when, in fact, no such relays are disclosed, taught or suggested by Shaw. The Shaw device could not function with polarized relays since the current in the Shaw plate circuit always flows in one direction and such relays are responsive only to a change in direction of flow of the current.

50. Gilbert, et al patent 669,942 discloses an automatic polarity reversal relay in a system for generating and distributing electric currents. Gilbert relates to that class of systems of electrical distributors in which lights and other translating devices are to be supplied with current at a practically constant

voltage, regardless of the speed of the generator or *its direction of rotation.*

51. Best Patent No. 1,663,750 which was not cited by the Patent Office, discloses a potentiometer device for measuring and indicating transmission units (decibels) which are sensed as voltage. Best employs a pair of stepping switches 8, 9, shown in detail in Figure 2, which illuminate numbered lights to show the position of the stepping switch arms.

52. Lamb Patent No. 2,062,915 which was one of the cited references in the Shaw application, discloses a stepping switch in a potentiometer device. In Lamb the arm 13 is successively stepped to incremental taps by means of solenoid 18. This patent was relied upon by the Patent Office in combination with Roberts to make application claim 12 obvious and Shaw admitted this, and is estopped to deny otherwise, by cancelling claim 12.

53. Widmer Patent No. 2,115,831 discloses a recording galvanometer, driven by a reversible motor, which automatically balances to measure the potential of the unknown voltage, which is created by thermocouple 9. Widmer employs a source of known potential 6, a potentiometer 8 and additionally includes a transformer winding 94 and a rectifier 93 to develop a voltage, which is switched into the circuit of the galvanometer 10 and unknown 9 in a direction to oppose the unknown. This switching is accomplished by switch contacts 92c, which selectively apply the opposing voltage across resistors 11 or 12, with a proper polarity depending upon the direction of imbalance of the unknown source 9 relative to the existing position of the potentiometer 8.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter of this action.

2. The presumption of validity (35 U.S.C. § 282) as to claims 1 and 3 of Shaw Patent No. 2,497,961 is destroyed, because (a) the most pertinent prior art, Wunsch Patent No. 2,285,-482; McAlpine Patent No. 2,444,202; Widmer Patent No. 2,115,831; and Gilbert Patent No. 669,942, showing automatic polarity reversal were not considered by the Patent Office and yet they disclosed the vital thing upon which the Shaw patent was allowed, and (b) the Shaw patent is a paper patent, unsupported by any use or exploitation, for which none of the secondary considerations or evidences of non-obviousness exist.

3. Claims 1 and 3 of the Shaw Patent No. 2,497,961 are invalid under 35 U.S.C. § 103 because the subject matter of each claim would have been obvious at the time the invention was made to a person having ordinary skill in the art.

4. Shaw Patent No. 2,497,961 is invalid under 35 U.S.C. § 112 because the claims are ambiguous and indefinte and do not distinctly claim the invention.

5. Shaw Patent No. 2,497,961 is invalid under Article I, Section 8 of the Constitution because the device disclosed lacked utility, was not useful and represented a step backward in the art.

6. Plaintiff did not call the attention of the Patent Office to Wunsch Patent No. 2,285,482 and its disclosure of automatic polarity reversal in a potentiometric circuit, which he knew of before he filed his application for the patent in suit. This constitutes inequitable conduct.

7. Claims 1 and 3 of the Shaw Patent No. 2,497,961 are invalid for failure to file a Supplemental Oath to cover the combination including automatic polarity reversal which invention was not embraced in the statement of invention or claims in the application as originally filed.

8. Shaw Patent No. 2,497,961 is not entitled to any appreciable range of equivalents because it is a paper patent and must be strictly construed.

9. Plaintiff has not met its burden of proof on the issue of infringement.

10. Defendant's digital voltmeters do not infringe claims 1 and 3 of the Shaw patent.

11. Defendant is entitled to judgment that claims 1 and 3 of Shaw Patent No. 2,497,961 are invalid and not infringed by defendant.